**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

**SUNG EIK HONG, YONG M. KOO, JOON G.**
**KIM, KEVIN K. LEE, YOON S. KIM, DONG IL**
**LIM, and HUN MIN PARK,**

       **Plaintiffs,**

    **-against-**

**QUEST INTERNATIONAL LIMOUSINE, INC.,**
**MANGIL PARK, and JAMES PARK,**

       **Defendants.**

------------------------------------------------------------------X

          **19-CV-04336 (SN)**

          <u>**OPINION & ORDER**</u>

**SARAH NETBURN, United States Magistrate Judge.**

   Sung Eik Hong, Yong M. Koo, Joon G. Kim, Kevin K. Lee, Yoon S. Kim, Dong Il Lim,

and Hun Min Park (collectively "Plaintiffs") sued Quest International Limousine, Inc. ("Quest"),

Mangil Park ("Mangil"), and James Park ("James") for violating the Fair Labor Standards Act

("FLSA"), New York Labor Law ("NYLL"), and New York Codes, Rules, and Regulations

("NYCRR"). <u>See</u> 29 U.S.C. §§ 206 *et seq.*; NYLL Art. 6 §§ 190 *et seq.*, 196-d; NYLL Art. 19

§§; 12 NYCRR § 142-2.1. The Plaintiffs were limousine drivers who provided services to

Quest's clients. They assert that the Defendants were their employers and are therefore liable

under the alleged federal and state law wage-and-hour claims and related common law claims.

   Defendant James moves for summary judgment, arguing that he was not the Plaintiffs'

employer and cannot therefore be found liable under the FLSA or NYLL. The motion is

GRANTED.

**BACKGROUND**

The following facts are undisputed except as otherwise indicated.

Plaintiffs were limousine drivers who provided services for Quest's clients. ECF No. 75, Ex. 5 Plaintiffs' Rule 56.1 Counterstatement of Material Facts ("CSMF") ¶ 1. They allege violations of the minimum wage and overtime provisions of the FLSA, violations of the NYLL, and common law claims of unjust enrichment, conversion, fraud, and misrepresentation. Id. ¶ 2; Compl. Plaintiffs allege that Quest, Mangil, and James were Plaintiffs' employers and are therefore liable for the alleged federal and state wage-and-hour claims and related common law claims.[1] CSMF ¶ 3.

The parties agree that James worked as a dispatcher for Quest and was responsible for answering phones, emails, and handling invoices and statements. Id. ¶¶ 4–5. They disagree, however, as to whether those were James's only responsibilities, and whether he qualified as the Plaintiffs' employer. Compare ECF No. 70, Defendant's Rule 56.1 Statement of Material Facts ("SMF") ¶¶ 4–9, with CSMF ¶¶ 4–9.

James asserts that he had no ownership interest in Quest, and that he did not (i) set the rates that Quest charged its customers, (ii) determine how much commission Quest would receive from a job, or (iii) decide how much drivers would be paid. SMF ¶ 6–7. Additionally, he states that he was not involved in the process of determining whether a potential driver would become affiliated with Quest, and that he had no supervisory responsibilities. Id. at ¶¶ 8–9.

---

[1] The Court respectfully refers to Mangil Park and James Park by their first names for clarity.

The Plaintiffs contest each of these assertions. They claim that his duties were often interchangeable with Mangil's; that he was in charge when Mangil was absent; that he was responsible for acquiring and negotiating terms with Quest's potential clients; and that he signed the drivers' checks, maintained their employment records, and determined their pay rates and other compensation. CSMF ¶ 5. Plaintiffs also claim that James exercised the same control and authority over Quest's drivers as Mangil; that he issued 1099s to drivers that did not work for Quest to create fictitious expenses; that he manipulated Quest's financial documents; that he completed licensing paperwork for the drivers; and that he maintained Quest's paperwork. Id. at 6–8. Furthermore, they claim that James closely supervised and managed the drivers' and office employees' work schedules, that he exercised discretion in assigning Plaintiffs' work, and that he supervised and directed drivers' schedules. Id. ¶ 9.

<b>DISCUSSION</b>

**I.     Summary Judgment**

**A.  Standard of Review**

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party bears the initial burden of establishing that there are no material facts in dispute and must provide "affirmative evidence" from which a factfinder could return a verdict in its favor. Id. at 257. Then "the burden shifts to the non-movant to point to record evidence creating a genuine issue of material fact." Salahuddin v. Goord, 467 F.3d 263,

3

273 (2d Cir. 2006). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. See Scott v. Harris, 550 U.S. 372, 378 (2007). Summary judgment is appropriate where there is not "any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party . . . ." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). To create a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Instead, the response "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).

### B.  Law Governing Employer Status

Personal liability may be imposed on employers for wage and hour violations under both the FLSA and NYLL. Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 192 (S.D.N.Y. 2003). Under the FLSA, "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "The Supreme Court has emphasized the 'expansiveness' of the FLSA's definition of employer." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (quoting Falk v. Brennan, 414

U.S. 190, 195 (1973)); see also Ansoumana, 255 F. Supp. 2d at 192 (quoting Reich v. Circle C Invs., Inc., 998 F.2d 324, 329 (5th Cir. 1993) ("[T]he FLSA's definition of employer is sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-à-vis its employees.")). The Court of Appeals treats the term "employer" for FLSA purposes as a "flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." Barfield v. New York City Health & Hosps. Corp., 537 F.3d 132, 141–42 (2d Cir. 2008).

The Court of Appeals uses an "economic reality" test to determine whether an individual is an employer. See Herman, 172 F.3d at 139. The four-factor test considers "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (quoting Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir. 1984)). No factor is alone dispositive, and the determination should be based upon a totality of the circumstances. Id.

The question of whether a defendant is a FLSA "employer" is a "mixed question of law and fact," involving "the application of a legal standard to a particular set of facts." Zheng v. Liberty Apparel Co. Inc., 617 F.3d 182, 185 (2d Cir. 2010) (cleaned up). The "historical findings of fact that underlie each of the relevant factors" and the "findings as to the existence and degree of each factor" are factual questions, while "the ultimate decision as to whether a party is an employer" is a legal question. Zheng v. Liberty Apparel Co., 355 F.3d 61, 76 (2d Cir. 2003). Accordingly, it is appropriate to grant summary judgment on the "employer" question where there are no disputes as to any genuine issue of material fact. See Jean–Louis v. Metro. Cable

Commc'ns, Inc., 838 F. Supp. 2d 111, 119 n.4 (S.D.N.Y. 2011) ("[N]othing . . . casts doubt on the propriety of treating [employment status] as a question of law where there are no genuine issues of material fact requiring a jury trial."); Thomas v. River Greene Construction Grp., LLC, No. 17-cv-06954 (PAE), 2018 WL 6528493, at *9 (S.D.N.Y. Dec. 11, 2018) ("Because none of the Carter factors . . . weigh in favor of plaintiffs, the Court finds that the material facts dictate the legal conclusion that [the defendant] was not plaintiffs' employer."). See, e.g., Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 135–36 (affirming district court's grant of summary judgment on the question of the defendant's "employer status"); Jianjun Chen v. 2425 Broadway Chao Restaurant, LLC, No. 16-cv-05735 (GHW), 2019 WL 1244291, at *9 (S.D.N.Y. Mar. 18, 2019) (granting defendant's summary judgment motion on the basis that they were not the plaintiff's employer).

Both the New York Court of Appeals and the Second Circuit Court of Appeals have remained silent on whether the standard for determining if someone is an employer is the same under both the NYLL and the FLSA. The statutory standard, however, is "nearly identical." See Olvera v. Bareburger Grp., LLC, 73 F. Supp. 3d 201, 206 (S.D.N.Y. 2014); NYLL § 190(3) ("'Employer' includes any person, corporation, limited liability company, or association employing an individual in any occupation, industry, trade, business or service."). Accordingly, courts in this District routinely apply the same tests to make the employer determination under both statutes. See Martin v. Sprint United Mgmt. Co., 273 F. Supp. 3d 404, 422 (S.D.N.Y. 2017).

## II.    Application

James argues that no evidence supports a finding that he was the Plaintiffs' employer under any of the Carter factors, and that he is therefore entitled to judgment as a matter of law.

Evaluating the evidence in the light most favorable to the Plaintiffs, the Court finds that no reasonable jury could determine that James was their employer under either the FLSA or NYLL.

Preliminarily, Plaintiffs attached affidavits by Plaintiffs Sung Eik Hong ("Hong") and Song Choi ("Choi"), in which they made several general statements that James and Mangil "exercised the same control and authority" over the business. See, e.g., ECF No. 75, Ex. 1, Sun Eik Hong Affidavit ("Hong Aff.") ¶ 20. They also assert that although Mangil was known to be Quest's owner, they variously state that James was either the "substantial and/or the real owner" or the "future owner" of Quest. Hong Aff. ¶ 7; ECF No. 75, Ex. 2, Scott Choi Affidavit ("Choi Aff.") ¶ 12. These statements amount to either bare conclusions of law, or are too general, unspecific, inconsistent, or unclear to create a disputed fact. For example, Choi's acknowledgment that Mangil was the true "owner," but that James might be the "future owner," amounts to an admission that James was *not* the current owner. Choi Aff. ¶¶ 7, 12. In addition, the Plaintiffs do not clarify Hong's statement that although he knew Mangil was "the 'owner'" . . . James Park was known as the 'substantial and/or real owner." Hong Aff. ¶ 7. They cite to no evidence in the record to bolster this assertion or provide the source of Hong's supposed knowledge indicating James's alleged "real" ownership.

As such, the Court finds that this evidence does not establish whether James was the Plaintiffs' employer and proceeds through the Carter factors. See Irizarry v. Catsimatidis, 722 F.3d 99, 109 (2d Cir. 2013) (finding that an allegation that an "individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status." (discussing Herman, 172 F.3d at 139).

### A.  Power to Hire and Fire Employees

Although the Plaintiffs claim that James had the power to hire and fire employees "either directly and/or indirectly," and that he was involved in "recruiting" potential drivers, their counter statement of facts cites to no evidence in support of these propositions. Furthermore, both Choi's and Hong's affidavits state that Mangil hired them, not James. See Hong Aff. ¶ 4; Choi Aff. ¶ 4. Indeed, they do not cite any evidence in the record that James played any role in hiring or firing any of the Plaintiffs.

Plaintiffs rely on James's deposition testimony to assert that he was "indirectly" involved in hiring and firing employees because he helped potential drivers in completing NY Taxi and Limousine Commission ("TLC") paperwork necessary for obtaining a TLC license. But even when viewed in the light most favorable to the Plaintiffs, this is a mischaracterization of his testimony. Instead, James testified that prospective drivers who came to discuss employment with Mangil would sometimes request TLC paperwork from James under the mistaken belief that it was Quest paperwork. ECF No. 75, Ex. 4, James Park Deposition Transcript ("James Tr.") at 27:11–27:23. James would then refer them either to the prospective drivers' own insurance companies or to the TLC for assistance. Id. at 28:02–29:05. He noted that this occurred "very seldomly," that the prospective drivers were asking for "information that [he] didn't have," and that "there was nothing [he] could do for them really." Id. at 27:15, 27:24, 28:25–29:01. Based upon the undisputed evidence in the record, no reasonable jury could find that James had the power to hire and fire employees, and therefore this factor weighs strongly in James's favor.

### B.  Supervision and Control of Work Schedules and Conditions of Employment

Plaintiffs next contend that James exercised supervision and control over their work schedules and conditions by nature of his position as a dispatcher at Quest. See Hong. Aff at ¶

12. Citing James's testimony, Plaintiffs argue that he exercised his discretion by assigning drivers to jobs, supervising stand-by drivers to ensure that they were waiting at a specific location, and directing the drivers when to take breaks or go home.

Yet the deposition transcript shows that although James had minimal discretion over which drivers he would send to a particular job (perhaps once per month), most of the time jobs were assigned on a first-come-first-served basis. Compare ECF No. 76 Plaintiffs' Memo in Opposition ("Ps' Opp.") at 10, with James Tr. at 32:05–33:18. In addition, Plaintiffs' representation that he directed them to take breaks or go home selectively ignores substantial portions of testimony: if Quest did not have any active reservations for limousines, James would let the drivers know that they did not have to wait, that they could leave and come back, or that they could leave for the day. See James Tr. at 33:25–38:18. Importantly, James repeatedly emphasized that it was the drivers who ultimately made the decision—he simply asked their preference. Id. at 36:24–38:18.

Additionally, Plaintiffs cite to a portion of Hong's deposition testimony in which he stated that he heard a conversation "between Mr. Mangil and his son" regarding a non-party driver, "saying oh that bastard did not come to work today do not give him the assignment." ECF No. 75, Ex. 3, Sung Eik Hong Deposition Transcript ("Hong Tr.") at 26:04–26:05. That testimony suggests, however, that it was Mangil that directed James not to give a driver the assignment as a dispatcher, not that James exercised his own discretion in that assignment. Even if it *was* James, the evidence concerns a non-party—not the Plaintiffs. Again, viewed in context, Plaintiffs' assertions of the degree of James's supervision and control over their work as a dispatcher fall short of what exists in the record.

Plaintiffs acknowledge that Mangil was "primarily responsible" for contacting Quest clients, and that James was "primarily responsible for dealing with drivers and dispatching drivers." Choi Aff. at ¶ 8. They allege, however, that James would assume Mangil's responsibilities when Mangil traveled approximately once per year, including negotiating transportation with Quest's customers. Id. at ¶¶ 9–11. Additionally, they allege that James asked another non-party driver to fill in as a dispatcher, and that James trained and supervised Quest's office personnel. Id.

These arguments encounter several problems. First, Plaintiffs fail to connect how James's alleged role in negotiating transportation for clients, directing and training office personnel, and directing a non-party to assist in dispatch amounted to supervision or control of the *Plaintiffs'* work schedules and conditions of employment. See Irizarry, 722 F.3d at 109 ("[T]o be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner *that relates to a plaintiff's employment*.") (emphasis added). The Court found no case standing for the proposition that, because a dispatcher necessarily directs workers as to where to drive and what clients to pick up, there is a sufficient level of supervision and control to support a finding that they are an employer. Instead, the Court finds that a dispatcher is more akin to a liaison between clients and drivers, with Quest's *clients'* needs ultimately determining a drivers' activities. Indeed, in nearly all the cases that the Court reviewed under similar facts, those other courts did not reach the question of whether a dispatcher qualified as an employer because the vast majority found either that limousine drivers were independent contractors under FLSA, or that their claims fell under the taxicab exemption. See, e.g., Munoz-Gonzalez v. D.L.C. Limousine Service, Inc., 904 F.3d 208 (2d Cir. 2018); Saleem v. Corporate Transportation Group, Ltd., 854 F.3d 131 (2d Cir. 2017); Cariani v. D.L.C. Limousine Service, Inc., 363 F.

10

Supp. 2d 637 (S.D.N.Y. 2005); <u>Arena v. Delux Transp. Services, Inc.</u>, 3 F. Supp. 3d 1 (E.D.N.Y.

2014). Although a different question was briefed in this motion, these cases suggest that there is

no per se rule that every time a driver is dispatched by a dispatcher, they have formed an

employee-employer relationship.

   Second, even reading the record in the best light for the Plaintiffs, they again

misrepresent the extent to which James supervised or trained any office employees. His

testimony supports a finding that when Quest hired someone to assist him in dispatching calls

during busy periods, he would show that person how to assist him—and that was all. <u>See</u> James

Tr. at 24:04–26:21. Furthermore, even if Plaintiffs' assertions were supported by the evidence,

the Plaintiffs were *not* office employees, making such arguments irrelevant.

   Plaintiffs do assert that James took out his anger on at least one driver—Mr. Choi—by

not assigning him driving jobs while he waited for long periods of time, and that Mr. Choi was

eventually "forced to become a part time driver" because Mangil and James "hated" him for

unknown reasons. Choi Aff. ¶¶ 13–14. This statement is very thinly supported. It does not

include any specificity as to the number of times that James supposedly was angry with Mr.

Choi, nor the difference in work that he received. It also does not state with any specificity when

or how Mr. Choi was "forced" into becoming a part time driver, aside from the bare assertion

that Mangil and James "hated him." <u>Id.</u> Indeed, it does not specify what part of that decision was

attributed to Mangil and what part was attributed to James. Such vague and conclusory

statements cannot create a genuine issue of material fact for trial. <u>See</u> <u>Wright</u>, 554 F.3d at 266.

   Even when viewed in the best light for the Plaintiffs, no reasonable jury could find,

based upon the undisputed evidence, that James exercised control over the Plaintiffs' work

11

schedules and conditions of employment. Considering the entirety of the Plaintiffs' evidence, the Court weighs this factor in the Defendant's favor.

### C.  Determination of the Rate or Method of Payment

Plaintiffs contend that James signed their checks one to two times per year when Mangil was out of the country. Hong Aff. ¶¶ 13, 18. They also allege that in one instance James determined the rate that a driver would be paid for a fare not listed in the standard farebook. Id. at ¶ 19. In addition, they assert that "James Park manipulated Quest International driver's financial documents." Id. at ¶ 23. Finally, they argue that James made supposedly fraudulent payments to non-party drivers of a different taxi company.

As addressed above, James's relationship to third parties (i.e., if he paid drivers of a different taxi company—fraudulently or otherwise) has no bearing on his employment relationship to the Plaintiffs. Second, as the James rightfully points out, the only evidence cited by the Plaintiffs of James's supposed determination of an out-of-farebook rate for a different driver is an inadmissible hearsay statement contained in Hong's affidavit. See Hong Aff. ¶ 19 ("I am aware of this fact *after listening to Dong Il Lim*, another Plaintiff in this case, talking about compensation paid to him for driving the customer to a location t [sic] not listed in the farebook.") (emphasis added); Fed. R. Evid. 801. It is not apparent why the Plaintiffs did not produce an affidavit directly Mr. Lim, but this allegation cannot be supported through Hong's hearsay statement alone. Third, Plaintiffs bare assertion that James manipulated the drivers' financial documents is too general and conclusory to "set forth *specific facts* showing that there is a genuine issue for trial." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56 (e)).

Finally, although Plaintiffs' affidavits claiming that James signed their checks weighs in their favor, the fact that he did so only once or twice per year, and only when Mangil was unavailable, weighs against the legal finding that he exercised similar authority and ownership over the company as his father. See, e.g., Michalow v. East Coast Restoration & Consulting Corp., No. 09-cv-05475 (SLT) (RML), 2017 WL 9400690, at *13 (E.D.N.Y. Jul. 11, 2017) (finding that the Defendant's issuance of two checks, without more, was insufficient to establish "formal or functional control, or merit liability as a joint employer"); Herman, 172 F.3d at 140 ("The key question is whether [the Defendant] had the authority to sign paychecks *throughout* the relevant period.") (emphasis added).

Given the FLSA's and NYLL's expansive view of employers, however, and viewing the evidence that in the best light for the Plaintiffs, the Court finds that a reasonable jury might find that by signing checks when Mangil was out of the country, James may have determined the method of payment on some occasions. Accordingly, the Court weighs this factor slightly in favor of the Plaintiffs.

### D.  Maintenance of Employment Records

Lastly, Plaintiffs assert that James was in charge of keeping and generating the drivers' records, that he forwarded the employee's financial documents to Quest's CPA, and that Hong received a 1099 reflecting inaccurate compensation.[2] As evidence, they cite to James's deposition testimony and Hong's affidavit. Again, a careful examination of James's testimony

---

[2] Plaintiffs also assert, through Hong's affidavit, that James issued false 1099s to drivers who worked for a different company, called "Korea Taxi." See Hong Aff. ¶ 24–25. As discussed above, allegations of James's alleged fraudulent relationship with non-parties—even if true—is irrelevant to the question of whether he maintained the Plaintiffs' employment records or was their employer.

undercuts the Plaintiffs' argument, as he testified that Quest maintained paperwork that contained the driver's license and driver's TLC number, among other things, *that was provided by the TLC*. See James Tr. at 30:07–22. Reading in context, James's testimony plainly concerned records for the TLC—not Quest—and that such records are not the type generally considered to be "employment records" under the FLSA. See 29 U.S.C. § 211 (c) ("Every employer . . . shall make, keep, and preserve such records of the persons employed by him and of the *wages*, *hours*, and other *conditions* and *practices* of employment.") (emphasis added).

In addition, Plaintiffs cite to the fact that James forwarded Quest's financial documents to the company's CPA, who in turn issued an inaccurate 1099 to one of the Plaintiffs, as evidence that he maintained employment records. Hong Aff. ¶¶ 24–25. To hold that the mere forwarding of financial records to a company's accountant would increase an individual's liability as an "employer" would likely implicate every low-level executive assistant or administrative assistant—an inference that the Court finds unreasonable. And the Plaintiffs' assertion that the 1099 issued by the CPA was "inaccurate" does not in turn support a finding that that James maintained records.

Accordingly, the Court finds that, based upon the undisputed evidence viewed in the best light for the Plaintiffs, no reasonably jury could find that James maintained the Plaintiffs' employment records. Accordingly, this factor weighs in favor of the James.

## CONCLUSION

Because the Plaintiffs did not raise any genuine issue of *material* fact, the Court may resolve the purely legal question, based solely upon the undisputed evidence in the record, as to whether James was their employer. See, e.g., Jean–Louis., 838 F. Supp. 2d at 119 n.4. In considering the four guiding Carter factors, the Court determines that James did not have the

14

power to hire and fire, did not exert control over the Plaintiffs' work schedules and conditions of employment, and did not maintain their employment records. Although James did occasionally sign Plaintiffs' paychecks, the evidence does not support a finding that he had such authority throughout the employment period. Accordingly, evaluating the Carter factors in a totality of the circumstances, the Court determines that James was not the Plaintiffs' employer under the FLSA or the NYLL as a matter of law. See Barfield, 537 F.3d at 141–42; accord Collinge v. Intelli-Quick Delivery, Inc., No. 2:12-cv-00824 JWS, 2018 WL 1088811, at *13 (D. Ariz. Jan. 9, 2018) (applying the Carter factors to find that an operations manager who had the power to hire and fire, to dispatch and direct drivers on delivery routes, and who on one occasion determined the rate of pay was not "the drivers' employer as a matter of 'economic reality'").

      Accordingly, for the foregoing reasons, Defendant James Park's motion is GRANTED. Given that the motion for summary judgment disposed of the FLSA and NYLL claims only, the parties are directed to meet and confer as to whether the Plaintiffs will continue to assert their state common-law claims of breach of contract, unjust enrichment, conversion, and fraud and misrepresentation against Defendant James Park. The Court will address all other remaining pretrial matters through a separate order.

      The Clerk of the Court is respectfully requested to GRANT the motion at ECF No. 69.

**SO ORDERED.**

_____

SARAH NETBURN

United States Magistrate Judge

Dated:      New York, New York
            May 28, 2021

15